957 So.2d 613 (2007)
THE FLORIDA BAR, Complainant,
v.
Mark F. GERMAIN, Respondent.
The Florida Bar, Complainant,
v.
Mark F. Germain, Respondent.
Nos. SC05-947, SC05-1096.
Supreme Court of Florida.
May 17, 2007.
*616 John F. Harkness, Jr., Executive Director, Kenneth Lawrence Marvin, Director of Lawyer Regulation, The Florida Bar, Tallahassee, FL, and JoAnn Marie Stalcup, Bar Counsel, The Florida Bar, Orlando, FL, for Complainant.
Mark F. Germain, pro se, Leesburg, FL, for Respondent.
PER CURIAM.
We review a referee's report recommending that Respondent Mark F. Germain be found guilty of unethical conduct and suspended from the practice of law for ninety-one days. We have jurisdiction. See art. V, § 15, Fla. Const. For the reasons explained below, we approve the referee's findings of misconduct but disapprove the referee's recommendation of a ninety-one day suspension and instead suspend the Respondent from the practice of law for one year.

PROCEDURAL BACKGROUND
The Florida Bar filed two separate complaints against Germain, which were consolidated and tried together before a referee. Before the hearing, the Bar and Germain entered into a stipulation about the facts. The stipulation established many of the facts alleged in the complaints, as well as other facts not alleged.
The referee filed two separate reports. The first report made factual findings and conclusions of guilt in both cases. The second and final report, issued after a separate hearing on the issue of discipline, contained the findings and conclusions contained in the first report, factual findings not made in the first report, findings concerning aggravating and mitigating factors, and recommendations of discipline. The facts, as found by the referee or as *617 established by the stipulation, are summarized below.

FACTUAL BACKGROUND

Case No. SC05-947
This case arose from a dispute between Germain and Michael C. Norvell concerning ownership of a building called the Lake Law Center (the building) and the employment of James Cardona, who was a paralegal first for Germain and then for Norvell. In November 2002, Germain executed a promissory note for $100,000 for Norvell in exchange for a one-third ownership of the building, where Germain and Norvell operated separate law firms. In April 2003, Norvell offered to purchase Germain's interest for $100,000. Germain rejected the offer.
In March 2004, Germain fired Cardona, his paralegal. The following month, Norvell increased his offer for Germain's interest in the building to $140,000. He also offered, in writing, to sell his two-thirds share to Germain for $280,000. Germain tentatively accepted the offer to purchase Norvell's interest, but was unable to obtain financing.
That same month, on April 17, Germain filed a police report alleging that Norvell had physically attacked him. The officer reported seeing a "large contusion on Mr. Germain's arm along with several slight abrasions." On April 19, Norvell entered one of the offices in the building, removed Germain's files, and sat behind the desk and in front of the computer. Germain and Norvell disputed ownership of that office. That same day, Cardona reported to work at the building, as Norvell had hired him. Cardona and Germain argued. Germain physically escorted Cardona off the premises.
The next day, April 20, Germain delivered a "no trespass" warning to Cardona's mother. Germain placed a lock on the door to the disputed office and placed a no-trespass warning on the door. The following day, Norvell removed the door from its hinges and entered the office. Germain called the police, who responded. Germain accused Cardona of trespassing even though he knew Cardona had Norvell's permission to be there and that Norvell owned two-thirds of the building. Germain then filed against Norvell a Petition for Injunction for Protection against Repeat Violence (Norvell Petition). In it, Germain swore that Norvell had a "hand gun with ammunition in our office." The court entered a temporary injunction against Norvell.
Germain also filed against Cardona a Petition for Injunction for Protection against Repeat Violence (Cardona Petition). In it, Germain alleged that "Cardona is stalking me and is trying to sabotage my law practice." The petition did not allege any acts of violence or repeat violence by Cardona, as those terms are defined in section 784.046(4)(a)-(b), Florida Statutes (2004), rendering the petition meritless. Cardona responded by filing against Germain a Petition for Injunction for Protection against Repeat Violence (Germain Petition).
A week later Norvell filed a suit for partition of the building and other relief (Partition Action). Germain filed an emergency motion in which he swore that "Norvell is also a convicted felon and Germain has personally observed Norvell handle a loaded pistol in the office."[1]
*618 On June 18, 2004, Germain and Norvell entered into a settlement agreement in the Partition Action. Germain agreed to withdraw the Norvell Petition and to execute an affidavit about the firearm allegation (June 18 Affidavit). The June 18 Affidavit stated: "after some thought, I recall that the pistol was actually in possession of the office paralegal, Rebecca S. Skipper and not Michael C. Norvell." It also stated: "At no time, was the gun ever in Norvell's office or in Norvell's possession" and "[t]hat sometime in 2001 Rebecca S. Skipper removed the gun from the office." Germain signed it under oath.
A few days later, Cardona filed a motion to dismiss the Cardona Petition. The motion also asked the court to award him $30,390 in attorney's fees as a sanction against Germain for filing a frivolous petition. The court held a hearing on the motion. Germain subpoenaed the police officer who took Germain's trespassing complaint, but the court would not allow the officer or Germain to testify. The court did allow Germain to proffer the testimony. The court dismissed the petition, finding that it "does not allege facts supporting an injunction for protection against repeat violence, and the facts proffered by petitioner failed to establish a basis for such an injunction. There was no evidence of violence or imminent fear of violence by respondent toward petitioner."
On July 1, 2004, Norvell paid Germain $140,000 for his one-third share of the building. Two weeks later, the court entered an amended order dismissing the Cardona Petition, denying Germain's motion for reconsideration, and granting Cardona's motion for sanctions. The court found Germain's claims were "so clearly devoid of merit both on the facts and the law as to be completely untenable."
A week later Germain filed a motion to disqualify the judge in the Cardona Petition case. The motion made sworn allegations that the judge should be disqualified, in part, because of a conflict of interest presented by his relationship with Lennon Bowen, an attorney, and Bowen's relationship with Cardona. Two days later he filed a motion for reconsideration of the Cardona Petition's dismissal, arguing the dismissal was improper without an evidentiary hearing. Germain swore the Cardona Petition was not frivolous because "convicted felon Michael C. Norvell's possession of a gun gun [sic] in the office is not frivolous."
Seven months later, in March 2005, Germain again moved the trial court to set aside the order dismissing the Cardona Petition. The motion alleged that the judge who dismissed the petition, who was no longer presiding over the case, had been Chief Assistant State Attorney when Germain sued the State Attorney years before and that the judge, as an assistant state attorney, prosecuted Germain in a contempt proceeding a few years later. According to Germain, Bowen, who had represented Cardona in prior proceedings, was the judge's campaign manager when the judge dismissed the petition. Germain also alleged the judge had solicited a campaign contribution from him while the petition was pending and that the solicitation was "inappropriate, if not illegal." In fact, Bowen was not the judge's campaign manager and never represented Cardona. The solicitation was a mass-mailed invitation to a fund-raising event mailed by a host committee, not the judge.
In several pleadings, in hearings before the trial court and the referee, and in his brief filed in this Court, Germain referred to Norvell as "a convicted felon," "cunning," *619 "devious," and "diabolical." He accused Norvell of killing an elderly client and threatening to kill him. Germain referred to Cardona as "a fugitive" and accused him of trespassing, stalking, and stealing.[2] He described them as "two convicted criminals vouching for each other."
The referee found "that no reasonable person would have feared that Norvell would kill, and that no reasonable person would have had a fear that would justify giving a false statement under oath." He also found the violence between Norvell and Germain had declined over time and that Germain had willingly remained in the space-sharing arrangement with Norvell.

Case No. SC05-1096
The second Bar complaint arose from Germain's actions in State v. Guerreo, No. 2004-CF-2140 (Fla. 5th Jud. Cir. Oct. 26, 2004) (order of contempt). Germain represented the defendant in a proceeding in September 2004. During that proceeding, the judge warned Germain that he was going to cite Germain for contempt if he continued to interrupt him. Despite the warning, Germain interrupted twice more. The judge cited him for two counts of direct criminal contempt. After a hearing, the judge found Germain guilty of two counts of contempt and fined him $100. Germain paid the $100, but filed a motion for reconsideration. The trial judge dismissed the order of contempt, but refused to order the refund of Germain's $100 fine.

RULE VIOLATIONS
The referee concluded that Germain's conduct violated rule 4-3.1 (failing to assert only meritorious claims and contentions), rule 4-3.3(a)(1) (making a false statement of material fact or law to a tribunal), rule 4-3.4(c) (knowingly disobeying an obligation under the rules of a tribunal), 4-3.5(c) (engaging in conduct intended to disrupt tribunal), and rule 4-8.4(d) (engaging in conduct in connection with the practice of law that is prejudicial to the administration of justice) (three counts) of the Rules Regulating the Florida Bar.
The referee found four aggravating factors: (1) previous discipline, including a public reprimand in 1997 for making disparaging remarks in several instances about opposing counsel and a judge and failing to follow the rulings of a trial judge; (2) a pattern of misconduct as established by the earlier misconduct of a similar nature; (3) multiple offenses; and (4) refusal to acknowledge the wrongful nature of his conduct. The referee found three mitigating factors: (1) absence of a dishonest or selfish motive; (2) personal or emotional problems; and (3) physical or mental disability or impairment.

RECOMMENDATION OF DISCIPLINE
The referee recommended a ninety-one-day suspension, followed by one year of probation after reinstatement; an evaluation by a Bar-approved mental health professional and abiding by any recommended treatment or counseling, continuing through the probationary period; and reimbursement of the Bar's costs. The referee relied on Florida Standards for Imposing Lawyer Sanctions 6.12, 6.22, and 8.2, as well as Florida Bar v. Adams, 641 So.2d 399 (Fla.1994).
Germain petitioned for review of the report. He contends the referee erred in *620 excluding evidence of Norvell's alleged exploitation of an elderly client, challenges several of the findings, questions the application of two of the aggravating factors, and argues that the referee erred in failing to find several additional mitigating factors. He also takes issue with the recommendations of a mental health evaluation and ninety-one-day suspension.

ANALYSIS
We first address the exclusion of evidence issue. A referee's admission of evidence is reviewed for abuse of discretion. Fla. Bar v. Rotstein, 835 So.2d 241, 244 (Fla.2002). In this case, the referee excluded testimony about Norvell's alleged actions involving an elderly client. Germain argues that this evidence was relevant to whether his fear of Norvell was reasonable and well-grounded, to support his claim that he signed the June 18 Affidavit under duress.
Assuming that Germain's allegations are true, the facts that Norvell unethically made himself a beneficiary under his client's will and then decided to remove her from life support does not tend to prove that he coerced Germain to execute the June 18 Affidavit. The referee did not abuse his discretion in excluding it. See § 90.404(2)(a), Fla. Stat. (2005) (providing that similar fact evidence of other crimes, wrongs, or acts is inadmissible when relevant solely to prove bad character or propensity). Moreover, any error would have been harmless. There is competent, substantial evidence in the record that Germain did not sign the June, 18 Affidavit under duress. Germain never advised the court that he had been coerced into signing it. He never sought to have the settlement overturned or set aside. He never filed a police report to the effect that Norvell unlawfully possessed a gun. Germain accused Norvell of having a gun in the office only in civil pleadings and civil hearings. These were not the actions of someone who believed he was in danger. Accordingly, we approve the referee's decision to exclude this evidence.
We next consider the factual findings Germain challenges. The party contending that the referee's findings of fact and conclusions as to guilt are erroneous carries the burden of demonstrating that there is no evidence in the record to support those findings or that the record evidence clearly contradicts the conclusions. Fla. Bar v. Carlon, 820 So.2d 891, 898 (Fla.2002). Specifically, Germain challenges the following findings: (1) the Cardona Petition was frivolous; (2) Germain's comments concerning the trial judge, Norvell, and Cardona were inappropriate; (3) Germain misled the police officer by not telling him that Cardona had Norvell's permission to be on the premises of the building; (4) Germain made false statements under oath; (5) Germain was not under duress when he executed the June 18 Affidavit; and (6) Norvell's violence toward Germain had declined over time.
Germain points to contradictory evidence in the record or, presumably, in his proffers, to support his claims of error. He nevertheless fails to meet his burden to demonstrate that there is no evidence in the record to support the referee's findings. The findings are supported in large part by the facts to which Germain stipulated.
In the June 18 Affidavit, Germain stated under oath that Norvell never possessed the gun, the gun was in the possession of a paralegal, and the paralegal had removed the gun from the office in 2001. Yet, both before and after June 18, 2004, Germain filed pleadings alleging that Norvell had a gun in the office. He tries to defend the fact that he lied under oath, either in the June 18 Affidavit or in the *621 pleadings filed before and after it, by claiming that Norvell coerced him to sign the affidavit. The referee found that "no reasonable person" would have been in fear of his life and that "no reasonable person" would have felt compelled to lie under oath.
Germain's failure to advise the court that he signed the affidavit under duress is compelling evidence that he was not coerced into signing it. The assertion of duress has other flaws, however. Accusing Norvell of having possession of a gun in subsequent civil pleadings was inconsistent with his purported fear of Norvell. Further, if the building was worth $700,000, as Germain claimed in his brief, Norvell would not have offered to sell Germain his two-thirds interest for $280,000. For that matter, Germain would have been able to obtain financing for $280,000 if the collateral had been worth over twice that amount.
Germain's points concerning the other disputed factual findings are equally flawed and boil down to credibility assessments. As the referee is in a unique position to assess witness credibility, this Court will not overturn his judgment absent clear and convincing evidence. See, e.g., Fla. Bar v. Carricarte, 733 So.2d 975, 978 (Fla.1999). There is no evidence that the referee's judgment is incorrect in this case. Accordingly, we approve these factual findings.
Germain also argues the referee erred in finding the aggravating factor of previous discipline based upon a finding that he had been publicly reprimanded for disparaging remarks about a judge. He also challenges the aggravating factor of refusal to acknowledge the wrongful nature of his conduct. Finally, he faults the referee for failing to find the following mitigating factors: (1) imposition of other penalties or sanctions; (2) remorse; and (3) remoteness of prior offenses.
Like other factual findings, a referee's findings of mitigation and aggravation carry a presumption of correctness and will be upheld unless clearly erroneous or without support in the record. Fla. Bar v. Arcia, 848 So.2d 296 (Fla.2003). A referee's failure to find that an aggravating factor or mitigating factor applies is due the same deference. See Fla. Bar v. Morse, 784 So.2d 414, 415-16 (Fla.2001); Fla. Bar v. Bustamante, 662 So.2d 687, 687 (Fla.1995); Fla. Bar v. Hecker, 475 So.2d 1240, 1242 (Fla.1985). Germain fails to meet his burden.
Competent, substantial evidence supports the referee's findings. As to the mitigating factor that other penalties already have been imposed, Germain paid Cardona $15,000 to settle an attorney's fee award greater than $30,000. Thus, his payment was less than half the amount awarded. Moreover, the Cardona Petition is only a small part of the conduct resulting in discipline. The $100 fine Germain paid in the criminal contempt-of-court case is also just a small part of this case. In light of all of Germain's misconduct, we cannot say the referee erred in failing to find that the imposition of these penalties or sanctions constituted mitigation.
Similarly, Germain presented little or no evidence of remorse upon which the referee could have based a finding of this mitigating factor. While Germain claims he apologized, both verbally and in writing, to the judge in the criminal contempt-of-court case, there is nothing to suggest he experienced any true remorse for his conduct, other than that his conduct cost him money. It is clear from his arguments that he still considers himself an innocent victim, first of Norvell and Cardona and then of the Bar, and still believes *622 that all of his conduct was appropriate and justified.
The mitigating factor of the remoteness of prior offenses also does not apply. On June 28, 2001, the Court ordered Florida Bar diversion in Case No. SC96944. This case was resolved one year before Germain became embroiled with Norvell as a co-owner of the building and only three years before most of the misconduct at issue here. Four years before the Florida Bar diversion, this Court publicly reprimanded Germain in Case No. SC90589. See Fla. Bar v. Germain, 705 So.2d 11 (Fla.1997) (table).
These same facts support the finding of the aggravating factor of previous discipline. In 1997, we publicly reprimanded Germain for making disparaging comments about opposing counsel and failing to comply with a trial court order. (Although the Bar dismissed the charge that he made disparaging comments about opposing counsel and a trial judge, the aggravating factor of previous discipline still applies.) The aggravating factor of previous discipline does not require the previous offense to be of the same nature. Rather, previous discipline for the same kind of misconduct establishes a pattern of misconduct or multiple offenses or increases the weight given to the previous discipline factor.
Germain's argument that he should not be penalized for continuing to assert his innocence in these proceedings is a closer question. The Court has held that "it is improper for a referee to base the severity of a recommended punishment on an attorney's refusal to admit alleged misconduct or on `lack of remorse' presumed from such refusal." Fla. Bar v. Lipman, 497 So.2d 1165, 1168 (Fla.1986); see also Fla. Bar v. Karten, 829 So.2d 883, 889-90 (Fla.2002); Fla. Bar v. Mogil, 763 So.2d 303, 312 (Fla.2000); Fla. Bar v. Corbin, 701 So.2d 334, 337 (Fla.1997).
At first glance, these cases seem to be in conflict with the Court's decision in Florida Bar v. Gersten, 707 So.2d 711 (Fla.1998). Upon closer examination, however, we conclude they are not. In Gersten, the respondent continued to refuse to comply with a court order to submit to the taking of his sworn statement after the order had been affirmed on appeal. Whether the respondent had an obligation to comply with the court's order was a legal issue, not a factual one. In Lipman, Karten, Mogil, and Corbin the respondents disputed the factual findings that they had engaged in the conduct giving rise to the rule violations. These were pure findings of fact.
The situation here is like that in Gersten, and unlike the situations in Lipman, Karten, Mogil, and Corbin. Germain has stipulated to most of the facts. He does not dispute that he engaged in the conduct. He nevertheless continues to assert that his actions did not constitute unethical conduct. These are legal issues. With a minimum of legal research, Germain could have discovered that his conduct did constitute unethical conduct and either curtailed his activities or avoided them altogether. Where the issue rests on a legal question, the aggravating factor of failing to acknowledge the wrongfulness of the conduct clearly applies. Accordingly, we approve the referee's findings concerning aggravating and mitigating factors.
Lastly, we address the recommendation of discipline. Germain argues that the recommendation of a mental health evaluation violates due process because he had no notice that his mental health was at issue. He also argues that the recommendation of a ninety-one-day suspension is improper, first, because he engaged in no *623 misconduct and, second, because it is too severe.
In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because it is ultimately the Court's responsibility to order the appropriate sanction. Fla. Bar v. Miller, 863 So.2d 231, 235 (Fla.2003); Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, 15, Fla. Const. Generally, the Court will not second-guess a referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions. Miller, 863 So.2d at 235; Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999).
The nature of Germain's arguments, the unusual series of events giving rise to this case, and Germain's inability to grasp the problematic nature of his conduct are enough to raise the issue of Germain's mental stability. The real issue, however, is whether Germain was or should have been aware that his mental state was at issue. See Carricarte, 733 So.2d at 979 (approving recommendation of mental health evaluation where Bar counsel mentioned a mental health evaluation in his closing argument at the conclusion of the guilt phase of the hearing).
Germain's own theory of defense made his mental state an issue. He claimed he was the victim of several vicious, unprovoked attacks and that he was in fear for his life when he signed the June 18 Affidavit. In addition, the referee's first report, which preceded the sanctions phase of the hearing, stated: "the undersigned finds that no reasonable person would have feared that Norvell would kill, and that no reasonable person would have a fear that would justify giving a false statement under oath." (Emphasis added.) The referee made several findings concerning the incidents of violence between Norvell and Germain and concluded that "the violence in these incidents declined over time. It is notable that after the July 2002 incident, Respondent willingly remained in the space-sharing arrangement with Norvell."
These findings and Germain's own arguments were sufficient to put Germain on notice that his mental state was at issue. Accordingly, we approve the recommendation for a mental health evaluation.
Next, we consider the appropriate discipline for Germain's misconduct. As set forth above, we will not second-guess a referee's recommended discipline as long as it has a reasonable basis in existing caselaw and the Florida Standards for Imposing Lawyer Sanctions. Having reviewed the standards, the cases involving similar misconduct, and the aggravating and mitigating factors found by the referee, we disapprove the referee's recommendation of a ninety-one-day suspension and instead suspend Germain for one year.
Standards 6.12, 6.22, and 8.2, which the referee cited, all support a suspension.[3] To determine the proper length, we obtain guidance from our previous cases. In Adams, 641 So.2d 399, in a letter and at a *624 hearing before a judge the respondent accused three opposing counsel of attempting to suborn perjury. None of the attorneys had done so; although there was cause for respondent to suspect one of the attorneys, there was no basis to suspect the others. This Court suspended him for ninety days. Our opinion does not mention aggravating or mitigating factors or previous discipline.
When we consider that Germain was previously disciplined for the same kind of misconduct and that he lied under oath and engaged in other misconduct, it is clear that a longer suspension is warranted here than in Adams. The Court views cumulative misconduct more seriously than isolated instances. Carlon, 820 So.2d at 899. This is the second time Germain comes before the Court for making disparaging comments about other professionals. These circumstances alone support the recommended ninety-one-day suspension.
However, that Germain lied under oath convinces us that an even longer suspension is warranted.
This court considers a lawyer who intentionally lies under oath to have committed an extremely serious offense. Our condemnation of this type of misconduct is not of recent vintage. In Dodd v. Florida Bar, 118 So.2d 17, 19 (Fla.1960), this Court stated:
No breach of professional ethics, or of the law, is more harmful to the administration of justice or more hurtful to the public appraisal of the legal profession than the knowledgeable use by an attorney of false testimony in the judicial process.
We have warned that such conduct warrants severe discipline and have dealt harshly with those who commit this offense.
Fla. Bar v. Cibula, 725 So.2d 360, 364 (Fla.1999) (suspending an attorney for ninety-one days after he lied under oath during two court hearings held in connection with alimony obligations); see also Fla. Bar v. Nunes, 734 So.2d 393 (Fla.1999) (imposing a three-year suspension for filing a frivolous lawsuit, continuing to represent clients after being discharged, making disparaging remarks about judges and opposing counsel, and making false representations to a tribunal, among other things); Fla. Bar v. Klausner, 721 So.2d 720 (Fla.1998) (imposing a three-year suspension for forging signatures on documents submitted to the court and lying about the misconduct to the court and in a sworn statement to an investigator with the state attorney's office, among other things); Fla. Bar v. Vining, 707 So.2d 670 (Fla.1998) (imposing a three-year suspension for misrepresentations in a stipulation submitted to the court while seeking funds in the court registry); Fla. Bar v. Segal, 663 So.2d 618, 622 (Fla.1995) (imposing a three-year suspension for making a false statement in a petition for discharge submitted to the probate court); Fla. Bar v. Kleinfeld, 648 So.2d 698 (Fla.1994) (imposing a three-year suspension for making false statements in an affidavit seeking disqualification of a judge in a contempt hearing against the attorney, among other things); Fla. Bar v. O'Malley, 534 So.2d 1159, 1162 (Fla.1988) (imposing a three-year suspension for false testimony in a suit against the attorney for return of bond collateral entrusted to him).
These cases support a three-year suspension. Nevertheless, in light of the mitigating factors found by the referee (absence of a dishonest or selfish motive, personal or emotional problems, and physical or mental disability or impairment), we impose a suspension of one year.

*625 CONCLUSION
For the reasons stated above, Mark F. Germain is hereby suspended from the practice of law for one year. The suspension will be effective thirty days from the filing of this opinion so that Germain can close out his practice and protect the interests of existing clients. If Germain notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Germain shall accept no new business from the date of this opinion until he is reinstated to the practice of law.
Before his reinstatement, Germain must submit proof that he has been evaluated by a licensed mental health professional approved by The Florida Bar, has complied with any recommended treatment or counseling, and is either continuing in treatment or counseling or has satisfactorily completed such treatment or counseling.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Mark F. Germain in the amount of $4,485.84, for which sum let execution issue.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] In September 1984, Norvell was granted a disciplinary resignation from The Florida Bar after he was suspended for criminal conduct. The underlying criminal conduct was a conviction in federal court of a felony drug offense for which he was sentenced to five years in prison. Norvell was reinstated to the practice of law in 1992.
[2] Cardona received two traffic citations for DUI in Alabama in October 1986. A warrant for his arrest was issued after he failed to appear. In November 2002, Cardona entered a guilty plea to the first DUI citation. The second Alabama DUI was dismissed. At that point, Cardona was no longer a fugitive.
[3] Standard 6.12 provides: "Suspension is appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action." Standard 6.22 provides: "Suspension is appropriate when a lawyer knowingly violates a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding." Standard 8.2 provides: "Suspension is appropriate when a lawyer has been publicly reprimanded for the same or similar conduct and engages in further similar acts of misconduct that cause injury or potential injury to a client, the public, the legal system, or the profession."